UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES,  Plaintiff,  v.  NATIONAL MEDIATION BOARD, Read Van de Water, Chairman, et al.,  Defendants. | Civil No. 05-2194-JDB |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

THEODORE C. HIRT
Assistant Branch Director

OF COUNSEL:

MARY L. JOHNSON
General Counsel
National Mediation Board
1301 K Street, N.W.
Washington, DC 20005

PETER T. WECHSLER (MA Bar)
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-2705
Email: peter.wechsler@usdoj.gov

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

    A.    THE RLA ........................................................................................................ 2

        1.    Conferences ...................................................................................... 3

        2.    Mediation ......................................................................................... 4

        3.    Arbitration ........................................................................................ 4

        4.    Emergency Board ............................................................................. 4

        5.    Self-Help .......................................................................................... 5

    B.    THE CONFIDENTIALITY OF MEDIATION ..................................................... 5

STATEMENT OF FACTS ................................................................................................. 6

    A.    THE BOARD'S MEDIATION PROCESS ........................................................ 6

    B.    THE BOARD'S MEDIATION OF THE UNION'S DISPUTE ............................. 9

    C.    THIS LAWSUIT ............................................................................................. 11

ARGUMENT .................................................................................................................... 11

I.    THE COURT SHOULD DISMISS THE UNION'S REQUEST FOR
    A PERMANENT INJUNCTION ................................................................................. 11

    A.    THE UNION CANNOT ESTABLISH SUCCESS ON THE MERITS ............ 12

        1.    Courts Apply a Presumption Against Judicial Review of
            Board Decisions ............................................................................... 12

        2.    A "Peek At The Merits" Demonstrates that the NMB Acted
            Within its Discretion in Continuing the Mediation Process ................... 16

a.    The Length of Time That Has Elapsed Without
a Proffer and the Perceived Lack of Recent Progress ...... 17

b.    The Board's Inaction on the Union's Most Recent
Request for a Proffer ...................................................... 19

B.    THE BALANCE OF HARMS WARRANTS DENIAL OF
PERMANENT INJUNCTIVE RELIEF .................................................. 22

CONCLUSION ................................................................................................................... 26

## TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

Alton & Southern Ry. Co. v. Brotherhood of Maint. of Way Employees,
883 F. Supp. 755 (D.D.C. 1995) ........................................................................... 26

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531 (1987) .................................... 12

Barton v. District of Columbia, 131 F. Supp.2d 236 (D.D.C. 2001) ........................... 12

Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369
(1969) ........................................................................................................... 4

Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non-Contract
Employees, 380 U.S. 650 (1965) ............................................................. 13, 17

Burlington N.R.R. Co. v. Brotherhood of Maint. of Way Employees,
481 U.S. 429 (1987) ................................................................................ 3, 18, 22

Davenport v. International Bd. of Teamsters, 166 F.3d 356 (D.C. Cir. 1999) ........... 12

Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,
396 U.S. 142 (1969) ...................................................................................... 26

International Ass'n of Machinists & Aerospace Workers v. National
Mediation Bd., 374 F. Supp.2d 135 (D.D.C. 2005) .......................... 13, 14, 17

International Ass'n of Machinists & Aerospace Workers v. TWA,
839 F.2d 809 (D.C. Cir.), amended, 848 F.2d 232 (D.C. Cir. 1988) ....... passim

International Ass'n of Machinists v. National Mediation Bd.,
180 F. Supp.2d 188 (D.D.C. 2002) ......................................................... 2, 14, 16

International Ass'n of Machinists v. National Mediation Bd.,
425 F. 2d 527 (D.C. Cir. 1970) ................................................................. passim

International Ass'n of Machinists v. National Mediation Bd.,
930 F.2d 45 (D.C. Cir. 1991) ..................................................................... passim

Leedom v. Kyne, 358 U.S. 184 (1958) ....................................................................... 17

Local 808, Bldg. Maint., Serv., & R.R. Workers v. National Mediation Bd., 888 F.2d
1428 (D.C. Cir. 1989) ................................................................................ passim

Newdow v. Bush, 355 F. Supp.2d 265 (D.D.C. 2005) ............................................ 12, 25

Pittsburgh & Lake Erie R.R. v. Railroad Trainmen, 179 F. Supp. 271
    (W.D. Pa. 1959) ............................................................................................ 4

Professional Cabin Crew Ass'n v. National Mediation Bd., 872 F.2d 456
    (D.C. Cir. 1989) ............................................................................................ 14, 17

Railway Labor Exec. Ass'n v. National Mediation Bd., 785 F. Supp. 167
    (D.D.C. 1991) ............................................................................................ passim

Railway & Steamship Clerks v. Florida E.C. Ry. Co., 384 U.S. 238 (1966) ............................ 18

Richards v. United States, 369 U.S. 1 (1962) ............................................................ 22

Securities Indus. Ass'n v. Board of Governors of Fed. Res. Sys.,
    628 F. Supp. 1438 (D.D.C. 1986) ............................................................ 25

Switchmen's Union v. National Mediation Bd., 320 U.S. 297 (1943) ............................ 13

United Transp. Union v. United States, 987 F.2d 786 (D.C. Cir. 1993) ............................ 5

Virgin Atlantic Airways Ltd. v. National Mediation Bd., 956 F.2d 1245
    (2d Cir. 1999) ............................................................................................ 13

Weinberger v. Romeo-Barcelo, 465 U.S. 305 (1982) ............................................ 25

Yakus v. United States, 321 U.S. 414 (1944) ............................................................ 25

## STATUTES

45 U.S.C. §§ 151, et seq ............................................................................................ 1

45 U.S.C. § 151a ............................................................................................ 22

45 U.S.C. § 152 ............................................................................................ 3

45 U.S.C. § 154 ............................................................................................ 3

45 U.S.C. § 155 ............................................................................................ 3, 4, 23

45 U.S.C. § 156 ............................................................................................ 3, 4

45 U.S.C. § 158 ............................................................................................ 3, 23

45 U.S.C. § 160 ............................................................................................ 5

45 U.S.C. §181-87 ....................................................................................... 3

## RULES AND REGULATIONS

29 C.F.R. § 1208.3(a) ................................................................................. 6

29 C.F.R. § 1208.5(a) ................................................................................. 6

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BROTHERHOOD OF MAINTENANCE<br>OF WAY EMPLOYEES,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL MEDIATION BOARD,<br>Read Van de Water, Chairman, <u>et al.</u>,<br><br>Defendants. | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) | Civil No. 05-2194-JDB |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## INTRODUCTION

Defendant the National Mediation Board ("NMB" or "Board"), acting under the Railway Labor Act of 1926, 45 U.S.C. §§ 151 <u>et seq.</u>, as amended ("RLA" or "Act"), is conducting mediation of an ongoing labor dispute between plaintiff, the Brotherhood of Maintenance of Way Employees Division/IBT ("Brotherhood" or "Union"), and the National Railroad Passenger Corp. ("Amtrak" or "Carrier"). Maintaining the status quo during the Board's dispute-resolution processes is "the key to the structure Congress established for bringing about settlements without industrial strife." <u>Local 808, Bldg. Maint., Serv., & R.R. Workers v. National Mediation Bd.</u>, 888 F.2d 1428, 1432 (D.C. Cir. 1989) ("<u>Local 808</u>"). During the mediation process, neither party is permitted to alter the status quo unilaterally by resorting to self-help such as a strike.

In this action, the Union is attempting to "dislodge the key" to the structure that Congress established, <u>id.</u>, 888 F.2d at 1433, by seeking to compel the Board to proffer arbitration and

release the Union from the mediation process. Judicial review of the Board's decisions is "one of the narrowest known to the law," International Ass'n of Machinists v. National Mediation Bd., 839 F.2d 809, 811 (D.C. Cir. 1988), amended, 848 F.2d 232 (D.C. Cir. 1988), cited in International Ass'n of Machinists v. National Mediation Bd., 180 F. Supp.2d 188, 190 (D.D.C. 2002) (denying plaintiffs' motion for preliminary injunction). Although the Union has asserted in conclusory fashion that the Act requires the Board to release the parties from the mediation process, see Complaint ("Comp.") ¶¶ 33, 37, the Union cannot, based upon the specific facts involved, surmount the "high threshold" applicable to that claim. International Ass'n of Machinists v. National Mediation Bd., 930 F.2d 45, 48 (D.C. Cir. 1991). In addition, the balance of harms warrants denial of the Union's request for permanent injunctive relief. The Union will not suffer irreparable injury to any of its rights or interests if the status quo is maintained while the statutorily mandated mediation process continues. The relief sought by the Union would interfere with the Board's ongoing efforts to resolve the dispute pursuant to the Act, would have an adverse impact on other pending and future cases, could seriously disrupt interstate commerce, and would thus harm the public interest. For all of these reasons, the Court should dismiss the Union's Complaint.

## BACKGROUND

### A.    THE RLA

The Act provides for the "prompt and orderly settlement" of labor-management disputes in the railroad industry and protects commerce and commercial carriers from the disruptions that such disputes may cause. 45 U.S.C. § 151a; see Local 808 v. NMB, 888 F.2d at 1431. Congress created the Board to administer the Act, 45 U.S.C. § 154, and assigned the Board the duty to

2

mediate disputes between unions and carriers, 45 U.S.C. §§ 155 & 158; see Local 808, 888 F.2d

at 1431-34. The statute was subsequently extended to cover the airline industry. 45 U.S.C.

§§ 181-87.

To accomplish these objectives, the Act imposes a "virtually endless" process of

negotiation and mediation. Burlington N.R.R. Co. v. Brotherhood of Maint. of Way Employees,

481 U.S. 429, 444 (1987). For that reason, the Act "does not have any express time limit on

mediation." International Ass'n of Machinists & Aerospace Workers v. National Mediation Bd.,

374 F. Supp.2d 135, 140 (D.D.C. 2005). As a general matter, the Act requires that the parties

"exert every reasonable effort" to negotiate a settlement. 45 U.S.C. § 152, First. An elaborate set

of steps is required under the Act, and the parties are prevented from resorting to self-help during

these steps, as set forth below.

1.    **Conferences:** A party desiring to effect a change of rates of pay, rules, or

working conditions must give advance written notice. 45 U.S.C. § 156. When agreements

become amendable, the parties exchange proposals for amending them. Section 6 of the Act

requires the parties to give at least thirty-days written notice of an intended change in

agreements, establishes time for the scheduling of conferences and negotiations, and requires the

parties to maintain the status quo during that process. The status quo must be maintained until a

settlement is reached or until the conferences terminate without a timely request for mediation or

efforts by mediation to bring the parties to agreement. 45 U.S.C. § 155 First.

2.    **Mediation:** If conferences fail to resolve the dispute, either or both parties may

invoke the services of the Board. 45 U.S.C. § 155 First. The Board may also invoke mediation

of a dispute sua sponte in the case of "any labor emergency . . . at any time." While most

3

mediation cases concern disputes over changes in rates of pay, rules or working conditions, other disputes under 45 U.S.C. § 155 First may also be subject to mediation under the Act.[1] Once the mediation process has been invoked, the parties remain bound by the status quo and may not engage in self-help such as a strike or a lockout, or make changes to the terms and conditions of employment. The statute authorizes the Board to "use its best efforts, by mediation, to bring . . . [the parties] to agreement." 45 U.S.C. § 155 First.

  **3.**   **Arbitration:** If the Board determines that mediation has failed, the Board must then try to induce the parties to submit the controversy to binding arbitration, which requires the consent of both parties. 45 U.S.C. § 155 First. If either party declines the proffer of arbitration, the parties are released by the Board from mediation, and they enter a thirty-day status quo or "cooling off" period. 45 U.S.C. §§ 155 First, 156, 157. See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378 (1969).

  **4.**   **Emergency Board:** If all of the foregoing steps fail to produce an agreement, yet another stage -- the creation of an Emergency Board by the President -- is authorized by the statute. The bar against self-help may be extended in the event that the NMB determines that the dispute "threaten[s] substantially to interrupt interstate commerce" by depriving an area of the country of "essential transportation services," and the President creates an Emergency Board. Under Section 10 of the Act, upon notification by the NMB of such a threat, the President may "in his discretion" create an Emergency Board "to investigate and report" to the President on the

---

[1] The only limitations on other disputes which may not be the subject of mediation under Section 5 First are:  (1) those disputes before the National Railroad Adjustment Board; and (2) those disputes over which the NMB has already released the parties from mediation under Section 5 of the Act.  See Pittsburgh & Lake Erie R.R. v. Railroad Trainmen, 179 F. Supp. 271 (W.D. Pa. 1959).

4

dispute. 45 U.S.C. § 160. During the thirty days given the Emergency Board to investigate and report on the dispute, and an additional thirty days after the report is delivered to the President, the parties may not unilaterally change the status quo. Id.

5.     **Self-Help:** If the President does not create an Emergency Board by the end of the thirty-day cooling-off period, or if the parties do not reach agreement after the Emergency Board issues its report, there is also the potential for Congress itself to become involved in the process, legislating against a strike and imposing a binding agreement on the parties. See United Transp. Union v. United States, 987 F.2d 786 (D.C. Cir. 1993) (upholding Congress' imposition on parties as their final agreement the report of a Presidential Emergency Board). If Congress does not get involved in this manner, the parties may then engage in self-help.

B.     **THE CONFIDENTIALITY OF MEDIATION**

Confidentiality attaches to the mediation process. The Board's regulations provide in relevant part as follows:

"Public policy and the successful effectuation of the NMB's mission require that Board members and the employees of the NMB maintain a reputation for impartiality and integrity." 29 C.F.R. § 1208.3(a). The parties to the Board's mediation "must have assurance, as must labor organizations and individuals involved in questions of representation, that confidential information disclosed to Board members and employees of the NMB will not be divulged, voluntarily or by compulsion." Id.

In addition, all documents "relating to the mediation function of the NMB, in the custody of the NMB or its employees relating to or acquired in their mediatory capacity under any applicable section of the [RLA] are hereby declared to be confidential." Id. § 1208.5(a). "No

such confidential documents or the material contained therein shall be disclosed to any

unauthorized person, or be taken or withdrawn, copied or removed from the custody of the NMB

or its employees by any person or by any agent of such person or his representative without the

explicit consent of the NMB." Id.  However, certain specific documents, such as a proffer of

arbitration and the notice of failure of mediatory efforts, "are matters of official record and are

available for inspection and examination." Id. § 1208.5(b).

## STATEMENT OF FACTS

### A.    THE BOARD'S MEDIATION PROCESS

The Board has mediated over 13,000 collective bargaining disputes in its 71-year history.

See the Declaration of Lawrence E. Gibbons dated January 5, 2006 ("Gibbons Decl."), ¶ 7.  The

Board's expertise in mediation ensures that bargaining disputes rarely escalate into disruptions of

passenger service and the transportation of commerce.  Id.  Historically, the Board has

successfully resolved 97 percent of its mediation cases without interruption to public service.  Id.

Since 1980, only one percent of cases involved a disruption of service.  Id.  The Board's success

in maintaining relative stability in the railroad and airline industries is not due to a set formula.

Id. ¶ 8.  As each mediation case is different, the approach used by the mediator is tailored to the

parties and issues involved, as well as the circumstances of the dispute.  Id.  The experience and

knowledge of the industries gained over the years by the Board and its staff are essential to the

Board's record of success.  Id.

Collective bargaining works most effectively when both parties to a dispute recognize

that they must deal with each other at the bargaining table.  Id. ¶ 9.  The compulsion to settle lies

at the heart of the RLA's procedures, requiring the parties to keep searching for possible

6

agreements through the mediation process, without the right to engage in self-help during that period. Id. The amount of time necessary for the Board to mediate a case under the RLA varies widely. Id. ¶ 10. In numerous cases, after seemingly interminable mediation, the parties have been led to reach agreement through the Board's use of the available mediation tools. Id. Chief among those tools is the passage of time, during which the parties are forced to reassess the most difficult issues confronting them. Id. ¶ 10. It is the Board's assessment of the circumstances of a dispute that control the procedure and timing of the mediation process. Id. ¶ 11. The Board has successfully mediated cases following substantial periods of mediation without a proffer of arbitration. Id. For example, in several cases the Board conducted mediation for periods from 1,211 days to 2,922 days without a proffer of arbitration. Id. and Attachment 2.

The present dispute, which was docketed by the Board on April 10, 2000, had been in mediation for 2039 days as of November 9, 2005, the date on which the Brotherhood commenced this lawsuit. Id. ¶¶ 12, 23. On that date, the Board's mediation case docket included 74 open cases in which no proffer of arbitration has been made. Id. As described below, the parties have had several negotiation and mediation sessions since April 10, 2000, the date on which the Board docketed the Union's application for mediation. Id. ¶ 28, 30. Although there have also been various contacts between the Board and the parties, there have been no joint mediation sessions since May 7, 2004. Id. ¶ 32. Such interregnums of joint sessions are not uncommon. Id. In addition, the Board's mediation efforts have continued unabated in this case, with steps other than joint mediation sessions taken, including communications between the Board and the parties' representatives. Id. ¶ 32.

- 7 -

It is the Board's judgment as to whether mediation efforts are unsuccessful that triggers a decision to proffer arbitration and, if at least one party does not accept the proffer, to release the parties from mediation.  Id. ¶ 13.  Any such decision by the Board is always a matter of careful judgment and consideration based on the Board's assessment of the facts and circumstances involved, including the positions of the parties (both public and confidential) and the overall environment of the labor/management relations at the time of the request.  Id.  For instance, even though a party may indicate for tactical purposes that its opponent's positions are completely unacceptable and that the party has no further offer to make, the party may also inform the mediator, in confidence, that its position is more flexible.  Id.  It is only when the NMB independently concludes that its efforts to bring about a settlement through mediation have ultimately proven to be unsuccessful that a proffer is issued.  Id. The Board's autonomy with respect to whether and when to proffer arbitration is an essential element of the RLA's mediation process.  Id.

The Board may proffer arbitration sua sponte or in response to a request from a party.  Id. ¶ 14.  The Board's receipt of a request to proffer arbitration does not necessarily mean that further mediation is futile, as with a jury's statement to a judge that it is deadlocked.  Id. ¶ 15.  It is well within the realm of the Board's experience for one or both of the parties to a mediation case to request or press for a termination of mediation.  Id.  However, absent other considerations, the perception by a party that the matter is deadlocked has not deterred the NMB's mediation efforts.  Id.

If a proffer is not made following a party's request or a staff recommendation, it always remains possible that a proffer might be made in the future if a majority of the Board finds that

- 8 -

changed circumstances warrant it. Id. ¶ 14. A proffer does not guarantee any particular outcome, but rather moves the dispute-resolution process to the next stage, which might result in arbitration, a Presidential Emergency Board, or self-help. Id. Even if the Board elects to issue a proffer, that does not mean that both parties would accept it. Id. ¶¶ 5, 33. And the parties to NMB mediation have the option of agreeing jointly to arbitrate their differences at any point in the case regardless of whether the NMB proffers arbitration. Id.

If permitted, judicial intervention in mediation cases would have a significant, adverse impact on pending and future mediation cases before the Board. Id. ¶ 17. If a court were to grant a request to order the Board to release the parties from mediation, the parties will not have the necessary incentive to accept compromise and accommodation in those final difficult stages of negotiation and mediation. Id.

### B.    THE BOARD'S MEDIATION OF THE UNION'S DISPUTE

Based upon the circumstances of this dispute, including confidential matters, it is the Board's considered judgment that the mediation efforts have not been exhausted and that a proffer of arbitration is not appropriate at this time. Id. ¶ 21.

On April 7, 2000, the Board received an application for mediation under the Act from the Brotherhood, stating that a labor dispute had arisen with Amtrak, a national passenger railroad that provides passenger service throughout the United States, over bargaining notices served by the parties. Id. ¶ 23 and Attachments (Att.") 3, 4. The Board docketed the application as NMB Case No. A-13080 on April 10, 2000. Id. ¶ 23 and Att. 5. The Board has also received applications from twelve other unions involving Amtrak, arising from the same round of contract negotiations, and has docketed those cases. Id. ¶¶ 24, 25. Four of the twelve unions have also

requested a proffer. Id. ¶ 26. To date, the Board has not proffered arbitration in any of these twelve cases or in the present case. Id.

On April 13, 2000, the Board received Amtrak's response to the Brotherhood's application for mediation. Id. ¶ 27 and Att. 6. On April 20, 2000 the Board assigned Mediators Les Parmelee and Fred Leif to the case. Id. ¶ 27 and Att. 7. One or both of them attended each of the mediation sessions discussed below. Id. ¶ 27.

Commencing on May 12, 2000, the parties attended a series of mediation and negotiation sessions through July of 2003. Id. ¶ 28 and Att. 9-16. On July 8, 2003, the Union requested that the Board proffer arbitration and release the parties from mediation, arguing that "[t]here is no possible basis for an amicable voluntary settlement of this controversy." Id. ¶ 29 and Att. 17. Amtrak opposed the Union's request. Id. ¶ 29 and Att. 19. On October 1, 2003, the Board denied the Union's request, stating that the Board had not yet exhausted its best efforts to assist the parties in reaching an agreement, and that the mediators assigned to the case would contact the parties to consider appropriate next steps. Id. ¶ 29 and Att. 20.

A further mediation session was held on May 7, 2004, with Chairman Fitzmaurice in attendance. Id. ¶ 30 and Att. 21. On March 29, 2005, the Union again requested that the Board proffer arbitration. Id. ¶ 31 and Att. 22. On April 11, 2005, Amtrak opposed the Union's request. Id. ¶ 31 and Att. 24. Although there have been various contacts between the Board and the parties, there have been no joint mediation sessions since May 7, 2004. Id. ¶ 32. Such interregnums of joint mediation sessions are not uncommon. Id. ¶¶ 11, 32.

The Board's current position not to proffer arbitration at this time is not a final decision. Id. ¶ 34. The Board has taken into consideration the Union's assertions regarding the perceived

lack of progress in the pending collective bargaining dispute with Amtrak. Id. As stated

previously, twelve other groups of employees also remain in mediation with Amtrak at this time,

and four of them also requested proffers of arbitration. Id. ¶¶ 26, 34. To date, the Board has not

proffered arbitration in any of those twelve cases or in the present case. Id.

### C.    **THIS LAWSUIT**

On November 9, 2005, the Union filed the Complaint, seeking to require that the Board

proffer arbitration immediately and release the Union from the mediation process. Comp. at p. 1;

p. 9, § D. The Union asserted that, despite the lack of joint negotiation or mediation sessions

since May of 2004, the Board denied the Union's first request for a proffer and has not yet acted

on the second request. Id. ¶¶ 32, 33, 37. The Union alleged that the Board thereby acted in a

"patently arbitrary and unreasonably" manner, id. ¶¶ 33, 37, violated its obligations (and those of

its members) under the RLA, id.¶¶ 33, 37, 40, and deprived the Union of its right to engage in

self-help, id. ¶ 38. The Union seeks a declaration to this effect, id. at p. 11 §§ A-C, and a

permanent injunction requiring the Board to proffer arbitration and release the Union from the

mediation. Id. at p. 11, § B.

### ARGUMENT

### I.    **THE COURT SHOULD DISMISS THE UNION'S REQUEST FOR A PERMANENT INJUNCTION**

In order to obtain a permanent injunction, the movant must establish success on the

merits and demonstrate that the injunction will cause irreparable injury to the movant, will not

substantially injure the opposing party, and will further the public interest. Davenport v.

International Bd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999); IAM v. NMB, 374 F.

- 11 -

Supp.2d at 139. Three of the standards for a permanent injunction are thus the same as those for a preliminary injunction. <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n. 12 (1987); <u>IAM v. NMB</u>, 374 F. Supp.2d at 137 (citing same).

A weak showing on any of the factors may warrant denial of the motion. If the movant "makes a particularly weak showing on one factor, however, the other factors may not be enough to 'compensate.'" <u>Barton v. District of Columbia</u>, 131 F. Supp.2d 236, 242 (D.D.C. 2001) (citing cases). In particular, "consideration of the public interest is particularly crucial in a suit seeking to enjoin governmental action being carried out pursuant to a statute." <u>Newdow v. Bush</u>, 355 F. Supp.2d 265, 293 (D.D.C. 2005) (citations omitted). As explained below, each of the factors weighs heavily against the issuance of injunctive relief.

### A.     <u>THE UNION CANNOT ESTABLISH SUCCESS ON THE MERITS</u>

#### 1.     <u>Courts Apply a Presumption Against Judicial Review of Board Decisions</u>

For more than half a century, there has been a well-settled presumption that the Board's decisions are generally unreviewable. <u>See</u> <u>Switchmen's Union v. National Mediation Bd.</u>, 320 U.S. 297 (1943). "A long line of cases" beginning with <u>Switchmen's Union</u> "has maintained the narrow scope of review given federal courts over the Board's exercise of its delicate responsibilities." <u>Railway Labor Exec. Ass'n v. National Mediation Bd.</u>, 785 F. Supp. 167, 168 (D.D.C. 1991). Indeed, judicial review under the Act is "'one of the narrowest known to the law.'" <u>Local 808</u>, 888 F.2d at 1433, quoting <u>International Ass'n of Machinists & Aerospace Workers v. TWA</u>, 839 F.2d 809, 811 (D.C. Cir.), <u>amended,</u> 848 F.2d 232 (D.C. Cir. 1988).

In <u>Switchmen's Union</u>, the Supreme Court held that, under the Act, Congress entrusted the responsibility for protecting the collective bargaining rights of employees exclusively to the

Board, and not to the courts. Id., 320 U.S. at 305. Accordingly, the Court declared that the Board's determinations in "representation disputes" -- those disputes in which the Board certifies the election of a collective bargaining representative -- were unreviewable "whether the (alleged) error be one of fact or law." Id. In Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non-Contract Employees, 380 U.S. 650 (1965) ("Railway Clerks"), the Supreme Court confirmed the presumption that the Board's actions under the Act are not reviewable.

Thus, courts have not applied "conventional principles of judicial review" to the Board's decisions under the Act. See, e.g., Virgin Atlantic Airways Ltd. v. National Mediation Bd., 956 F.2d 1245, 1250 (2d Cir. 1999) (refusing to apply the APA). In International Ass'n of Machinists v. National Mediation Bd., 425 F. 2d 527 (D.C. Cir. 1970), the court rejected the position taken by the Union here, explaining: "Restricted and constrained is the ambit of scrutiny and procedures that may properly be made available by and in the courts consistently with the purpose and contemplation of the Railway Labor Act." Id. at 538. Courts afford a "presumption of validity" to Board actions, "equivalent to that of legislative findings." IAM v. NMB, 180 F. Supp.2d at 191 n. 2. If "any state of facts" might be supposed that would support the Board's action, "those facts must be presumed to exist," and the court has no jurisdiction to review the Board's decision. Id. (citation omitted). As a result, a claim of bad faith or statutory violation "is difficult to advance." Id.

As a result of these principles, judicial review of the Board's decisions is available only where the plaintiff has established, on the face of the pleadings, that the decision involves "patent official bad faith," was a "gross violation" of the Act, or violated the constitutional rights of an employer, employee, or union. IAM v. TWA, 839 F.2d at 811 (citing Railway Clerks, 380 U.S.

- 13 -

at 658-60, 661-662); <u>Professional Cabin Crew Ass'n v. National Mediation Bd.</u>, 872 F.2d 456,

459 (D.C. Cir. 1989); <u>International Ass'n of Machinists v. National Mediation Bd.</u>, 180 F.

Supp.2d 188, 190 (D.D.C. 2002) (citing same). <u>IAM v. NMB</u>, 374 F. Supp.2d at 142. Judicial

review of the Board's decisions is thus "reserved for the most extreme situations." <u>Local 808</u>,

888 F.2d at 1439. Where, as here, the plaintiff does not allege any constitutional violation, the

court's authority to review the NMB's decision to keep a dispute in mediation is "limited to those

extraordinary and exceptional situations in which the NMB's actions constitute patent official

bad faith." <u>IAM v. NMB</u>, 374 F. Supp. 2d at 140. This "extraordinarily limited review"

provides the Board with "the broad discretion and much needed flexibility so essential for the

proper fulfillment of the Board's functions." <u>Railway Labor Exec. Ass'n v. NMB</u>, 785 F. Supp.

at 168.

In the absence of a showing of bad faith, courts lack authority to review the Board's

actions. <u>Local 808</u>, 888 F.2d at 1434. As the D.C. Circuit cautioned in <u>Local 808</u>, "[a] court

may not make inquiries about the mediator's understanding of the parties' positions, about the

Board's reasons for its actions, or about the basis for the Board's belief that efforts to mediate

might still be successful." <u>Id.</u> at 1435. In order to effectively mediate between the parties to the

dispute, the Board must operate in private: "It will not make findings, or even statements to the

public, for these would undercut its status as a body recognized by both sides as impartial. . . ."

<u>IAM v. NMB</u>, 425 F.2d at 539 (paraphrasing testimony at Congressional Committee Hearings);

<u>see</u> <u>also</u> Gibbons Decl. ¶¶ 18-20. For this reason, courts do not apply to the Board the

"conventional principle" that a court may reject "an administrative action that is not accompanied

by a statement of reasons." <u>IAM v. NMB</u>, 425 F.2d at 538. Were a court to inquire into the

- 14 -

"reasoning process of the Mediation Board in regard to maintenance of mediation," such an inquiry could potentially force the Board to reveal something that would be "destructive of the mediation process in general, including future cases not yet born." Id. at 540; see also Gibbons Decl. at ¶ 20.

In employing this standard of review, the D.C. Circuit has long recognized the preeminent and exclusive role of the Board in resolving labor-management disputes in the railroad and airline industries.  In 1989 and 1991, the D.C. Circuit has rebuffed efforts by a party in mediation to have the federal courts interfere in the Board's mediation processes.  See IAM v. NMB, 374 F. Supp.2d at 140 n.4.  In 1989, the D.C. Circuit reversed a district court decision that required the Board to proffer arbitration and terminate mediation.  Stating that courts "have only an 'extraordinarily limited' authority to review decisions of the Board," the Circuit held that, "absent a showing of patent official bad faith," courts did not have jurisdiction to interfere with the Board's mediation process.  Local 808, 888 F.2d at 1433-34 (citations omitted).   Similarly, in 1991, the D.C. Circuit rejected a union's effort to be released from further mediation. International Ass'n of Machinists v. National Mediation Bd., 930 F.2d 45 (D.C. Cir. 1991).  As the Circuit emphasized, "we are not entitled to prevent the Board from experimenting with any mediation device that can fairly be said to be designed to settle a dispute without a strike and does not independently offend other laws." Id. at 48.  It reached that conclusion even though the Board's then-Chair stated that the mediation had failed.  As the Circuit observed, judicial inquiry into that statement, and what it signified, would be both intrusive and likely to prolong the dispute. Id. at 49.

- 15 -

In 2002 and 2005, the District Court applied these principles to deny a union's requests for injunctive relief against the Board. IAM v. NMB, 180 F. Supp.2d at 191 (Robertson, J.). (denying motion for injunctive relief regarding the Board's decision to recommend that the President convene an Emergency Board); IAM v. NMB, 374 F. Supp.2d at 1 & n.1 (Urbina, J.) (Denying motion seeking to compel the Board to proffer arbitration and release the parties from the mediation process).[2]

### 2.    A "Peek At The Merits" Demonstrates that the NMB Acted Within its Discretion in Continuing the Mediation Process

In determining whether there is jurisdiction to hear a claim that the Board committed a gross violation of the Act, a court may only take a "'peek at the merits' to look for obvious error on the face of the papers–a 'narrow role' indeed." Id., 785 F. Supp. at 168, quoting Professional Cabin Crew, 872 F.2d at 459. Unless that "peek" reveals that the challenged government action is "contrary to a specific prohibition in the Act," Leedom v. Kyne, 358 U.S. 184, 188 (1958), any further judicial review is barred. See Professional Cabin Crew Ass'n, 872 F.2d at 459 (absent an error that is obvious on the face of the papers, the court is not empowered to consider what the Act should provide "in terms of policy and broad generalities"). The Supreme Court has made clear that this "'narrow'" and "'painstakingly delineated'" judicial exercise is not deemed to be an "'exception'" to the general rule that the Board's actions under the Act are unreviewable. Railway Clerks, 380 U.S. at 659 (citations omitted).

---

[2]  Similarly, in 1991, this Court (Gesell, J.) held that it lacked jurisdiction to review the Board's interpretation of the Act regarding who should pay for neutral mediators serving on special boards of adjustment. Railway Labor Executives' Ass'n v. NMB, 785 F. Supp. at 168-69.

The Union based its claim of "patent official bad faith" upon the length of time that the dispute has been in mediation, the perceived lack of recent progress in that process, and the Board's inaction on the Union's most recent request for a proffer.  See Comp. ¶¶ 32-33, 36-38. With respect to the Union's assertions that the Board failed to fulfill its statutory duties or engaged in bad faith, a "peek at the merits" of this claim establishes that none of these allegations is sufficient to establish bad faith or a violation of the Act.  See IAM v. TWA, 839 F.2d at 811. In order to pursue its claims against the Board, the Union must surmount a "high threshold" to establish such "patent official bad faith" on the part of the Board as to allow the Court to intervene in an ongoing labor dispute.  IAM v. NMB, 930 F.2d at 48 (The union "is swimming upriver.").

### a.   The Length of Time That Has Elapsed Without a Proffer and the Perceived Lack of Recent Progress

Central to the Union's claims are the length of time the labor dispute has been in mediation and the perceived lack of recent progress.  See Comp. ¶¶ 9, 32, 36.  In order to protect commerce from the disruptions that labor-management disputes in the railroad industry may cause, see Local 808, 888 F.2d at 1431, the Act imposes an "almost interminable," Detroit & Toledo Shore Line R.R. Co v. United Transp. Union, 396 U.S. 142, 149 (1969) ("Shore Line"), "purposely long and drawn out," Railway & Steamship Clerks v. Florida E.C. Ry. Co., 384 U.S. 238, 246 (1966), and "virtually endless" process of negotiation and mediation.  Burlington N.R.R. Co. v. Brotherhood of Maint. of Way Employees, 481 U.S. at 444.  For these reasons, the Act "does not have any express time limit on mediation."  IAM v. NMB, 374 F. Supp.2d at 140.

The Union asserts that the Board's decision not to proffer arbitration after five years of mediation, with a perceived lack of progress in the past year and a half, amounts to "patent official bad faith." See Comp. ¶¶ 9, 32. In June of 2005, this Court rejected a similar claim regarding a matter that had been in mediation for more than four years. See IAM v. NMB, 374 F. Supp.2d at 140 (union alleged that "the dispute has been in mediation for such a long time that the [NMB's] refusal to proffer arbitration indicates bad faith."). As the Court noted in rejecting that claim, mediation that continued for more than four years "is not unusual in comparison to other NMB disputes." Id. at 141. The Court reasoned that the Board's "power to hold the parties in mediation is an important tool to bringing the parties to conciliation." Id. at 140 and cases cited. "Only in the most extreme circumstances will a court find a period to be completely and patently unreasonable so as to indicate patent official bad faith." Id. at 141, quoting Local 808, 888 F.2d at 1439. In addition, the Court reasoned that the standard of patent bad faith is not met by the mere passage of time alone, even when the amount of time spent in mediation was more than customary. IAM v. NMB, 374 F. Supp.2d at 141, citing IAM, 425 F.2d at 541.

These same points apply to the Union's claims in the present case. The Act does not limit the Board's options as to the process and timing of mediation, and the Board uses its considerable experience in resolving labor-management disputes, as well as its knowledge of the specific dispute, in applying the available mediation tools to a dispute. Gibbons Decl. ¶ 8. The compulsion to settle lies at the heart of the RLA's procedures, requiring the parties to keep searching for possible agreements through the mediation process, without the right to engage in self-help during that period. Id. ¶ 9. The procedures and timing of the mediation process are

- 18 -

based on the Board's assessment of the dispute, rather than on the parties' perceptions. Id. ¶ 11. As a result, the amount of time necessary for the Board to mediate a case under the RLA varies widely. Id. ¶ 10. In many cases, after seemingly interminable mediation (up to 2,922 days from the date the Board docketed the dispute), the parties have been led to reach agreement through the Board's use of the available mediation tools, including the passage of time, during which the parties are forced to reassess the issues confronting them. Id. ¶¶ 10, 11, 16.

Based upon the circumstances of this dispute, including confidential matters, it is the Board's considered judgment that its mediation efforts in this case (and related cases involving Amtrak) have not been exhausted, and that a proffer of arbitration is not appropriate at this time. Id. ¶ 21, 34. For these reasons, the Board's decision to continue mediation over an extended period of time, rather than proffering arbitration now, does not violate the Act or constitute bad faith.

### b.    The Board's Inaction on the Union's Most Recent Request for a Proffer

The Union also claims that the Board and its members violated the Act by not yet acting on the Union's most recent request for a proffer. See Comp. ¶¶ 26, 36, 40. This Court recently rejected a similar claim in IAM v. NMB, where one of the Board's three members voted in favor of the union's request for a proffer, one voted against it, and the third declined to vote. Id., 374 F. Supp.2d at 138, 141. Just as the Act does not impose a time frame on the mediation process, it does not require the Board or its members to proffer arbitration within any particular period. It is the Board's judgment as to whether mediation efforts are unsuccessful, rather than the parties' perceptions, that triggers the proffer of arbitration and the release of the parties from mediation. Gibbons Decl. ¶ 14. A decision to proffer requires the written approval of the majority of the

- 19 -

three Board members. Id. ¶¶ 14-15. The Board's autonomy with respect to whether and when to proffer arbitration is an essential element of the RLA's mediation process. Id. As the Court noted in IAM v. NMB, the Board's inaction on a request for a proffer "may serve as a mediation technique because 'withholding of the proffer is a crucial tool for encouraging compromise and settlement.'" Id. at 141, quoting Local 808, 888 F.2d at 1443.

The mere fact that the Union renewed its request for a proffer of arbitration due to a perceived lack of recent progress in the mediation did not mean that further mediation was futile, as with a jury's statement that it is deadlocked. Gibbons Decl. ¶ 15. It was then, and remains now, the Board's considered judgment that its mediation efforts in this case (and related cases involving Amtrak) have not been exhausted, and that a proffer of arbitration is not appropriate at this time. Id. ¶¶ 21, 26, 34. As a result, the Board has not yet acted on the Union's renewed request for a proffer, while the Board reserves the option of proffering arbitration at a later date if a majority of its members find that changed circumstances warrant it. Id. ¶¶ 15, 34.[3] Thus, as the Court recently found in IAM v. NMB, the Board is permitted to leave a request for a proffer pending. Id., 374 F. Supp.2d at 141.

In sum, a "peek" at the statutory language shows no conflict between the Board's actions and the Act's provisions, and the Union's allegations are insufficient to establish patent official bad faith. As the Court reasoned in denying injunctive relief in IAM v. NMB, the factors described by the Union, namely the length of time the dispute has been in mediation combined with the perceived lack of recent progress, do not "clearly evidence patent official bad faith." Id.

---

[3] Conversely, even if the Board were to proffer arbitration at some point, that would not guarantee any particular outcome, but rather would move the dispute-resolution process to the next stage, which might result in arbitration, a Presidential Emergency Board, or self-help. Id.

at 142. To the contrary, the Board performed its statutorily authorized duties in a straightforward manner. By analogy, even in a situation where the Board has required parties to agree to the creation of a special Presidential Emergency Review Board that would not be subject to the thirty-day statutory reporting period before the Board would release the parties from mediation, the court has refused to review the Board's actions. IAM v. NMB, 930 F.2d at 49. The court is "not entitled to prevent the Board from experimenting with any mediation device that . . . does not independently offend other laws." IAM v. NMB, 374 F. Supp.2d at 142, quoting IAM v. NMB, 930 F.2d at 49.

The Board's decision to continue mediation in this case directly advances the RLA's central purposes. It is a fundamental tenet of statutory construction that courts "'look to the provisions of the whole law, and to its object and policy.'" Richards v. United States, 369 U.S. 1, 11 (1962) (citations omitted). Longstanding precedent establishes that "the major purpose of Congress in passing the Act was to 'provide the machinery to prevent strikes' and the resulting interruptions of interstate commerce." IAM v. NMB, 425 F.2d at 533 (citations omitted). Accord Shore Line, 396 U.S. at 148; Local 808, 888 F.2d at 1431; see also 45 U.S.C. § 151a. To achieve this objective, it is "crucial" that the Act establish an "almost interminable process." Shore Line, 396 U.S. at 149; accord Burlington N.R.R. Co., 481 U.S. at 444 (Act creates "virtually endless" process). The procedures of the Act "are purposefully long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." Shore Line, 396 U.S. at 149 (citations omitted).

When considered along with the protracted nature of the dispute-resolution process,

"[t]he Act's status quo requirement is central to its design."  Shore Line, 396 U.S. at 150; accord

Local 808, 888 F.2d at 1432.  As the Supreme Court has explained:

> [S]ince disputes usually arise when one party wants to
> change the status quo without undue delay, the power
> which the Act gives the other party to preserve the status
> quo for a prolonged period will frequently make it
> worthwhile for the moving party to compromise with the
> interests of the other side and thus reach agreement without
> interruption to commerce.

Shore Line, 396 U.S. at 150.

In requiring continued mediation here, the Board promotes the Act's chief objectives,

implementing the intention of Congress to create an "almost interminable" process, without

resort to self-help, thereby averting disruption to interstate commerce.  That the Board thereby

requires the parties to follow this lengthy process despite a perceived lack of recent progress is

precisely what Congress intended.  Consequently, the postponement of the Union's ability to

strike does not constitute a basis for challenging the Board's interim decisions to require

continued participation in the mediation process.  Rather, permitting a challenge to the Board's

decisions while the dispute-resolution process is ongoing would defeat the primary goals of the

Act and would harm the public interest, as discussed below.

## B.    THE BALANCE OF HARMS WARRANTS DENIAL OF PERMANENT INJUNCTIVE RELIEF

Apart from being unable to prevail on the merits, the Union cannot demonstrate

irreparable harm, as would be required in order to obtain the permanent injunction it seeks.  The

Act's restriction on resorting to self-help during the mediation process applies equally to all

parties, and this restriction is temporary.  By operation of the Act, the parties eventually can resort to self-help, but only <u>after</u> the statute's dispute resolution procedures have been exhausted. 45 U.S.C. § 155 First, 156, 157.  If the Board declines to make a proffer following a party's request, it always remains possible that changed circumstances may lead to a proffer at some future date, and the parties are always free jointly to agree to mediation.  Gibbons Decl. ¶¶ 15, 33.  Conversely, even if the Board were to proffer mediation at some point, that does not mean that both parties would accept the proffer.  <u>Id</u>. ¶¶ 5, 33.  A proffer by the Board would not guarantee any particular outcome, but rather would move the dispute-resolution process to the next stage, which might result in arbitration (if both parties accept the proffer), a Presidential Emergency Board, or self-help.  <u>Id</u>. ¶¶ 15, 33.

The Union has not alleged any specific harm as a result of the Board's failure to proffer arbitration and release the Union from the mediation process.  Any alleged loss of income by the Union's members pending completion of the mediation process "does not constitute irreparable injury because the financial loss can be remedied with money damages."  <u>IAM v. NMB</u>, 374 F. Supp.2d at 142 and cases cited.  In addition, even apart from the Board's interests in protecting its statutory role in the resolution of labor disputes, there is a balance of harms as between the Union and the Carrier, which is also an interested party.  <u>Id</u>. at 142.  Granting the injunctive relief sought by the Union might harm the Carrier, by releasing the Union from mediation and potentially expediting a work stoppage.  <u>Id</u>.

The constraints under which the Union must currently operate reflect Congress' intention when it developed the Act's structure and established the Board's authority.  As this Circuit has recognized, the Act to this extent is purposefully coercive.  <u>IAM v. NMB</u>, 930 F.2d at 47.  As

- 23 -

this Court stated, "the public interest likely lies in keeping the dispute in the mediation process as envisioned by the Railway Labor Act." IAM v. NMB, 374 F. Supp.2d at 143. As Circuit Judge Edwards observed, the fact that one side "feels disadvantaged by maintenance of the status quo is absolutely irrelevant under the law. It is the nature of disputes in mediation for one party to feel squeezed." Local 808, 888 F.2d at 1442. Judicial review would interfere with this aspect of the dispute-resolution process. IAM v. NMB, 930 F.2d at 49 (noting that the RLA's effectiveness "depends . . . on the . . . assurance that neither party will be able to enlist the courts to further its own ends") (citation omitted).

Furthermore, the damage to the public interest that would arise from a permanent injunction far outweighs any alleged injury to the Union that would result from the denial of its motion. While the public interest is a critical factor to weigh in evaluating any application for injunctive relief, it is especially crucial where, as here, the suit seeks to restrain governmental action taken pursuant to a statute designed for the public interest. See Weinberger v. Romeo-Barcelo, 465 U.S. 305, 312-13 (1982); Yakus v. United States, 321 U.S. 414, 440-41 (1944); Newdow v. Bush, 355 F. Supp.2d at 293; see also Securities Indus. Ass'n v. Board of Governors of Fed. Res. Sys., 628 F. Supp. 1438, 1543 (D.D.C. 1986) (where enforcement of statute was at issue, "the equities to be balanced are not simply those of the private litigants, but also the interest of the public as defined by Congress").

In this case, the "primary objective" of Congress in enacting the Act is to "prevent[] strikes," in order to avoid disruption to interstate commerce. Shore Line, 396 U.S. at 154. If permitted, judicial intervention in mediation cases would have a significant, adverse impact on pending and future mediation cases before the Board. Gibbons Decl. ¶ 17. If a court were to

- 24 -

grant a party's request to be released from the Board's mediation, the parties to mediation would not have the necessary incentive to accept compromise and accommodation in those final difficult stages of negotiation and mediation. Id.

There is a substantial public interest in allowing the mediation process to go forward, without interruption, in an effort to bring the parties to agreement without any resort to self-help by either side. As courts have repeatedly observed, the Act creates a long, purposefully deliberate dispute-resolution process. Progression through each step escalates the pressure on the parties to reach an accord. The Board's decision to require continued mediation here implements a long-standing process for the resolution of disputes affecting interstate commerce. Were an injunction to issue, thereby interrupting the Board's ongoing work, this would impede the statutory process that impels the parties to reach an accord.

In Alton & Southern Ry. Co. v. Brotherhood of Maint. of Way Employees, 883 F. Supp. 755, 764 (D.D.C. 1995), Judge Hogan accurately described the consequences of a threatened strike by certain railway unions that would occur unless the Act's processes were pursued to their conclusion:

> [T]he purpose of the RLA is to prevent railroad strikes and interruptions to interstate commerce. Detroit & Toledo, 396 U.S. at 148. . . . Where, as here, the public is threatened with a loss of vital rail service and an interruption to interstate commerce long before the disputing parties have exhausted the RLA dispute resolution procedures, there can be little doubt that the public interest lies in enforcing the parties' obligation to maintain the status quo pending the exhaustion of the RLA's remedies. Id.

Denial of the Union's claim for injunctive relief in this case is, therefore, supported by the public interest in the uninterrupted implementation of the dispute-resolution processes established by the Act. In this case, the public interest requires that the parties proceed through

all of the stages established by the Act in an attempt to resolve their labor dispute, while avoiding

the serious adverse economic consequences of a strike.  This is a compelling, overriding public

interest that warrants denial of the Union's claim for permanent injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Union's Complaint, in its

entirety, with prejudice.

Dated: January 10, 2006

                                        Respectfully Submitted:

                                        PETER D. KEISLER
                                        Assistant Attorney General


                                        KENNETH L. WAINSTEIN
                                        United States Attorney

                                        THEODORE C. HIRT
                                        Assistant Branch Director


                                        _Peter T. Wechsler_
                                        _____
OF COUNSEL:                             Peter T. Wechsler (MA Bar)
                                        Trial Attorney
Mary L. Johnson                         United States Department of Justice
General Counsel                         Civil Division

National Mediation Board                Federal Programs Branch
1301 K Street, N.W.                     20 Massachusetts Avenue, N.W.
Washington, DC 20005                    Washington, D.C. 20530
                                        Tel.: (202) 514-2705
                                        Fax: (202) 616-8470
                                        Email: peter.wechsler@usdoj.gov
                                        Attorneys for the National Mediation Board

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2006, a copy of the foregoing Memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Peter T. Wechsler