UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, DIVISION, IBT <br><br> Plaintiff <br><br> v. <br><br> NATIONAL MEDIATION BOARD, Read Van de Water, Chairman, et al. <br><br> Defendants | Case. No. 1:05CV02194 |

**DECLARATION OF LAWRENCE E. GIBBONS**

I, Lawrence E. Gibbons, hereby declare and state as follows:

1. I have been employed by the National Mediation Board (Board or NMB) since 1997 and have served as the Director of its Office of Mediation Services since March 2002. In that capacity, I oversee all mediation matters that come before the Board. I also mediate at certain stages of the mediation process in some matters, on an as-needed basis. I was previously a Senior Mediator with the Board. Prior to my service with the Board, I dealt with labor-management issues as a management official for more than 25 years.

2. As Director, I am familiar with the regulations, policies, procedures and practices of the Board in connection with mediation proceedings, and I am the custodian of the Board's mediation case files and records, which are located at the Board's headquarters in Washington, D.C. This declaration is based upon my personal knowledge and my review of the Board's records.

1

## THE BOARD'S AUTHORITY TO MEDIATE DISPUTES UNDER THE RLA

3. The primary purpose of the Railway Labor Act (RLA or Act), 45 U.S.C. § 151, *et seq.*, is to minimize the disruptions to interstate commerce in the airline and railroad transportation systems. The RLA imposes a duty upon carriers and the unions representing their employees "to exert every reasonable effort to make and maintain agreements covering rates of pay, rules and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier . . . ." (Attachment 1). As discussed below, the RLA also establishes a series of steps, including mediation conducted by the Board, for the parties to resolve labor disputes, and prevents the parties from engaging in self-help, such as a strike, lockout, or change in the terms and conditions of employment, until the conclusion of the mediation process and the expiration of applicable "cooling-off" periods.

4. Congress created the Board to administer the Act, 45 U.S.C. § 154, and empowered the Board to resolve labor disputes between unions and carriers, 45 U.S.C. §§ 155, 158. The Board's statutory mediation process involves a series of steps which are taken to resolve the parties' contract issues.

5. First, the parties engage in direct negotiations. If the parties cannot reach agreement in direct meetings, one or both of them will apply for the Board's mediation services. The mediator assigned by the Board engages in mediation with the parties. If the Board at some point decides, in its judgment, that its mediation efforts have been unsuccessful, the Board will proffer binding arbitration to the parties. A proffer of arbitration does not guarantee any particular outcome. The unresolved issues are submitted to an arbitrator only if both parties agree to the proffer. Some parties will reject the proffer. Regardless of whether the NMB proffers arbitration, the parties are free at any time in the mediation process to agree to arbitrate

2

their differences. If the Board proffers arbitration and either party declines the proffer, the Board releases the parties from mediation and they enter a 30-day "cooling-off" period during which neither party may resort to self-help. During that period, the Board may attempt to bring the parties to agreement, by holding "public interest meetings." Under the Act, if the dispute is not settled through these means, and "should, in the judgment of the Mediation Board, threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," the Board shall notify the President, who, "in his discretion," may convene a Presidential Emergency Board (PEB), during which time the parties are not permitted to engage in self-help. 45 U.S.C. § 160. There have been 238 PEBs convened in the Board's history. Following the issuance of a report by the PEB, the parties may choose to accept the PEB's recommendation or engage in self-help after another 30-day period, unless Congress acts to prevent self-help.

6. The Act provides that the Board "shall use its best efforts" to settle collective bargaining disputes. In so doing, the Board uses a variety of approaches in mediation. The Board generally assigns one mediator to each contract dispute.* In some instances, cases are re-assigned. Each mediator develops an approach to the case based upon the specific facts of the dispute as well as the mediator's experience and judgment. The mediator also develops a relationship with the parties' negotiators over a period of time. Mediators use a variety of techniques and tools to bring parties to agreement. In particular, a mediator may elect to meet jointly with the parties, with one party only, or with principals only, and may also communicate with the parties by telephone, either jointly or separately. Another tool used by mediators is the timing, location, and frequency of meetings. Each of these approaches is based on the

---

* Additional staff or even Board members may, on occasion, meet with the parties during the mediation process.

3

mediator's professional judgment as to the best manner to move the parties toward agreement.

7. The NMB has mediated over 13,000 collective bargaining disputes in its 71-year history. The Board's expertise in mediation ensures that bargaining disputes rarely escalate into disruptions of passenger service and the transportation of commerce. Historically, some 97 percent of all NMB mediation cases have been successfully resolved without interruption to public service. Since 1980, only one percent of cases have involved a disruption of service.

8. The Board's overall success in maintaining relative stability in the railroad and airline industries is not due to a set formula. As each mediation case is different, the approach used by the mediator is tailored to the parties and issues involved, as well as the circumstances of the dispute. The experience and extensive knowledge of the industries gained over the years by the Board and its mediation staff are essential to the Board's record of success.

9. Collective bargaining works most effectively when both parties to a dispute recognize that they must deal with each other at the bargaining table. The compulsion to settle lies at the heart of the procedures of the RLA, requiring the parties to keep searching for possible agreements through the mediation process, without the right to engage in self-help during that period.

10. The amount of time necessary for the Board to mediate a case under the RLA varies widely. In numerous cases, after seemingly interminable mediation, the parties have been led to reach agreement through the Board's use of the available mediation tools. Chief among those tools is the passage of time, during which the parties are forced to reassess the most difficult issues confronting them.

11. The Board's assessment of the circumstances of any particular dispute control the procedure and timing of the mediation process. It is important to note that the NMB has

successfully mediated cases following substantial periods of mediation without a proffer of arbitration. For example, in several cases the Board conducted mediation for periods ranging from 1,211 days to 2,992 days without a proffer of arbitration. (Attachment 2.) In the Board's 71-year history, there have been only two cases in which a court has ordered the NMB to proffer arbitration and thus release the parties from mediation, and both decisions were reversed by the Court of Appeals. IAM v. NMB, 425 F.2d 527 (D.C. Cir. 1970), and Local 808 v. NMB, 888 F.2d 1428 (D.C. Cir. 1989).

12. The present dispute, which was docketed by the Board on April 10, 2000, has been in mediation for 2039 days as of November 9, 2005, the date on which BMWED commenced this lawsuit. On that date, the Board's mediation case docket included 74 open cases in which no proffer of arbitration had been made.

13. The Complaint states that the Act requires the NMB to proffer arbitration "at once" when mediation efforts are unsuccessful. Id. para. 35. However, the issue under the Act is whether the Board has determined that its mediation has been unsuccessful, rather than the view of the parties. It is the Board's judgment that triggers the proffer of arbitration and the release of the parties from mediation. In this context, any decision to proffer is not delegated by the Board to an individual mediator or staff member but, rather, is the product of an informed internal process that ultimately requires the written approval of the majority of the Board. Any decision by the Board whether and when to grant a request to release the parties from mediation is always a matter of careful judgment and consideration, based on the Board's assessment of the facts and circumstances involved, including the positions of the parties (both public and confidential) and the overall environment of the labor/management relations at the time of the request. For instance, even though a party may indicate for tactical purposes that its opponent's positions are

completely unacceptable and that the party has no further offer to make, the party may also inform the mediator, in confidence, that the party's position is more flexible. It is only when the NMB independently concludes that its efforts to bring about a settlement through mediation have ultimately proven to be unsuccessful that a proffer is issued. The Board's autonomy with respect to whether and when to proffer arbitration is an essential element of the RLA's mediation process.

14. The Board may proffer arbitration <u>sua sponte</u> or in response to a request from a party. In either situation, the mediation staff makes a recommendation to the Board Members, and the Members vote by notation. Each Member may vote to grant or decline to grant a proffer, or may decline to vote at that time. A proffer is made only when at least two Members vote to do so. If a proffer is not made following a party's request or a staff recommendation, it always remains possible that a proffer might be made in the future if a majority of the Board finds that changed circumstances warrant it. Moreover, as previously discussed, an arbitration proffer does not guarantee any particular outcome, but rather moves the dispute-resolution process to the next stage, which might result in arbitration, a PEB, or self-help.

15. The Board's receipt of a request to proffer arbitration does not necessarily mean that further mediation is futile, as with a jury's statement to a judge that it is deadlocked. It is well within the realm of the Board's experience for one or both of the parties to a mediation case to request or press for a termination of mediation. However, absent other considerations, the perception by a party that the matter is deadlocked has not deterred the NMB's mediation efforts. The relationships between labor and management in the railroad industry typically have their ups and downs over a period of time, with evolving periods of disagreement.

16. The act of withholding a proffer, as well as the uncertainty and apprehension of the

parties as to its ultimate issuance, have proven to be an effective mediation device in numerous instances. Once the NMB releases the parties from mediation, and the President convenes a PEB, the PEB typically utilizes a structured, almost quasi-adjudicative process involving hearings, formal exhibits, and position statements, as well as briefs, and the PEB issues a report that is widely distributed. Such a structured and public approach is in sharp contrast to the necessarily informal, private, and highly flexible nature of the RLA's mediation process.

17. If permitted, judicial intervention in mediation cases would have a significant, adverse impact on pending and future mediation cases before the Board. It is common for a party in NMB mediation proceedings to request that the Board proffer arbitration. When the NMB determines to continue the use of mediation, although the party may be dissatisfied, the party generally continues to make reasonable efforts to negotiate, and such efforts often lead to settlement. Given that the need to compromise is often unpalatable to a party, if another avenue were available to avoid compromise, it is not unlikely that the party would utilize it frequently. In summary, if courts were to order the Board to release the parties from mediation, the parties would not have the necessary incentive to accept compromise and accommodation in those final difficult stages of negotiation and mediation.

## THE CONFIDENTIALITY OF THE MEDIATION PROCESS

18. In discussing the BMWED's request to be released from mediation, the Board is obligated to maintain the confidentiality of the mediation process, including the specific basis for the Board's decision regarding the BMWED's request. The Board's policy of confidentiality is necessary to ensure the integrity of the mediation process and the trust and confidence of the parties to labor disputes.

19. The Board's Regulations provide in relevant part that the parties to the NMB

mediation "must have assurance, as must labor organizations and individuals involved in questions of representation, that confidential information disclosed to Board members and employees of the NMB will not be divulged, voluntarily or by compulsion," 29 CFR § 1208.3(a); and that all documents "relating to the mediation function of the NMB, in the custody of the NMB or its employees relating to or acquired in their mediatory capacity under any applicable section of the [RLA] are hereby declared to be confidential." 29 CFR § 1208.5(a).

20. Based upon these regulations, as well as the principles upon which they are based, the Board must be extremely cautious not to breach the confidential mediation relationship between the Board and the parties. As mediators, we are largely dependent for our effectiveness on the parties' willingness to disclose sensitive factual data and other confidential information to us. Our continuing ability to obtain such disclosures is necessarily based on the Board's unqualified commitment to maintaining the parties' confidences. In addition, it is essential that the parties do not perceive any public statements made by the NMB to be partisan. Accordingly, the underlying circumstances of this dispute and many of the facts therein have not been disclosed nor addressed by this declaration.

## BMWED and AMTRAK

21. Based upon the circumstances of this dispute, including confidential matters, it is the Board's considered judgment that its mediation efforts in this case have not been exhausted, and that a proffer of arbitration is not appropriate at this time.

22. The National Railroad Passenger Corp. (AMTRAK) is a national passenger railroad that provides passenger service throughout the United States.

23. On April 7, 2000, the Board received an application from the BMWED entitled "Mediation Application – BMWED-AMTRAK." (Attachment 3.) BMWED stated that a

dispute had arisen between the BMWED and AMTRAK over bargaining notices served by the parties. BMWED invoked the Board's mediation services pursuant to the RLA, 45 U.S.C. §§ 151; 155, First. (Attachment 4.) The Board docketed the application as NMB Case No. A-13080 on April 10, 2000. (Attachment 5.)

24. The Board has also received twelve other applications and docketed cases involving AMTRAK with the following unions on the following dates: International Brotherhood of Electrical Workers (IBEW) (8/3/2000); International Brotherhood of Boilermakers and Blacksmiths (IBB&B) (10/30/2000); International Association of Machinist and Aerospace Workers (IAM) (11/08/2000); Sheetmetal Workers (SMWIA) (11/16/2000); Brotherhood of Railroad Signalmen (BRS) (8/15/2001); United Transportation Union (UTU) (7/22/2003); Joint Council of Carmen (JCC) (10/7/2004); Fraternal Order of Police (FOP) (11/9/2004); American Train Dispatchers Association (ATDA) (11/9/2004); Yard Masters (UTU) (1/18/2005); National Council of Fireman and Oilers (NCFO-SEIU) (5/19/2005); and the Transportation Communications International Union (TCU) (Supervisors) (12/27/2005).

25. All of these cases involving AMTRAK arose from the same round of contract negotiations.

26. In addition to the BMWED, the IBEW, BRS, IAM and FOP have asked the Board for a proffer. To date, the Board has not proffered arbitration in any of these cases.

27. On April 13, 2000, the Board received AMTRAK's response to the BMWED's application for mediation. (Attachment 6.) On April 20, 2000 the Board assigned Mediators Les Parmelee and Fred Leif to the case. (Attachment 7.) One or both of them attended each of the mediation sessions listed below.

28. The mediators offered mediation sessions for May 11 and 12, 2000. Ultimately

mediation was held on May 12, 2000. (Attachment 8.) The parties continued their negotiation and mediation sessions on June 16, 2000; July 13 and 14, 2000; August 22 and 23, 2000; September 12, 2000; June 4, 2001; August 27 and 28, 2001; April 10 and 11, 2003; May 1 and 2, 2003; and July 2, 2003. (Attachments 9-16.)

29. On July 8, 2003, the BMWED filed with the Board a request for a proffer of arbitration, arguing that "[t]here is no possible basis for an amicable voluntary settlement of this controversy." (Attachment 17.) On July 11, 2003, the Board solicited the AMTRAK's comments on the request for a proffer. (Attachment 18.) AMTRAK filed its response with the Board on July 22, 2003, stating its position that the release was inappropriate. (Attachment 19.) On October 1, 2003, the Board denied BMWED's request, stating that "it ha[d] not yet exhausted its best efforts to assist the parties in reaching an agreement." The Board further stated that "Mediator Parmelee will contact the parties to consider appropriate next steps." (Attachment 20.)

30. A mediation session was held on May 7, 2004, with Chairman Fitzmaurice in attendance. (Attachment 21.)

31. On March 29, 2005, the BMWED again requested that the Board proffer arbitration. (Attachment 22.) On the same day, the Board requested AMTRAK's comments regarding BMWED's request. (Attachment 23.) On April 11, 2005, AMTRAK responded to this request. (Attachment 24.)

32. Although there have been various contacts between the NMB and the parties, there have been no joint mediation sessions involving an NMB mediator and representatives of BMWED and AMTRAK since May 7, 2004. Such interregnums of joint mediation sessions are not uncommon.

33. Even if the Board elects to issue a proffer in a case, that does not mean that both

parties would accept it. Further, as previously noted, the parties to NMB mediation have the option of agreeing jointly to arbitrate their differences at any point in the case regardless of whether the NMB proffers arbitration.

34. The Board's current position not to proffer arbitration at this time is not a final decision. The Board is aware of, and has taken into consideration, the BMWED's asserted difficulties in connection with the pending collective bargaining dispute with AMTRAK. As stated previously, twelve other groups of employees also remain in mediation with AMTRAK at this time, and four of them also requested proffers of arbitration. The Board has not proffered arbitration in any of those cases.

35. The documents attached to this Declaration (Attachments 1-24) are true and correct copies of documents from the National Mediation Board's official files.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 5TH, 2006, in the District of Columbia.

_____
Lawrence E. Gibbons
Director, Office of Mediation Services
National Mediation Board